**ORIGINAL**

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**FILED**

KIMBERLY EDWARDS,

2005 JUN 30 ı P 2: 59

        Plaintiff,

Case No. 04-72683

U.S. DISTRICT COURT
ANN ARBOR

-vs-

CHIEF JUDGE BERNARD A. FRIEDMAN
MAGISTRATE JUDGE STEVEN D. PEPE

JO ANNE B. BARNHART
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

_____/

### REPORT AND RECOMMENDATION

Plaintiff Kimberly Edwards brought this action under 42 U.S.C. § 405(g) and §

1383(c)(3) to challenge a final decision of the Commissioner of Social Security denying her

application for Supplemental Security Income benefits under Title XVI of the Social Security

Act. Plaintiff's motion for remand, and Defendant's motion for summary judgment have been

referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

For the reasons that follow, IT IS RECOMMENDED that Plaintiff's Motion for Remand be

GRANTED.

I.    BACKGROUND

    A.    Procedural History

Plaintiff filed an application for SSI on May 13, 2002 (R. 23). The Social Security

Administration denied her application on September 6, 2002 (R. 14). On July 9, 2003,

Administrative Law Judge ("ALJ") Lubomyr Jachnycky held a hearing at which Plaintiff

appeared with counsel and testified (R. 233-52). Vocational Expert ("VE") James Fuller also

testified. On August 25, 2003, ALJ Jachnycky issued a decision denying Plaintiff's claim,

finding that Plaintiff retains residual functional capacity to perform 8,000 jobs in the region (R. 14-23). The Appeals Council denied Plaintiff's request for review on May 21, 2004 (R. 5).

B.   Background Facts

Plaintiff, born November 14, 1967, was thirty-five years old at the time of the ALJ's decision (R. 15). Plaintiff has a high school education, and worked as a packer, general office clerk, retail market manager, cashier, bartender, and machine tender/inspector (R. 15). Plaintiff became unable to work on March 19, 2002, because of spondylolisthesis and compression of the thecal sac (R. 15).

1.   *Plaintiff's Hearing Testimony*

Plaintiff testified that she lives with her boyfriend, who works from six in the morning until seven at night (R. 226). She is able to take care of her personal hygiene, and dress herself (R. 227). She does not do chores, except occasionally a few dishes, relying on her boyfriend to do the laundry and cooking, and her sister to clean the house (R. 227-28). Her hobbies are cross-stitching and crocheting, but she is unable to concentrate on it for very long (R. 229). She used to be active in a number of sports, but is now unable to do any (R. 241).

During a typical day, Plaintiff wakes up around seven or eight in the morning after having difficulty sleeping during the night, and usually takes a nap during the day (R. 226). She reports that she has not enjoyed a full night's rest since her surgery, sleeping at most four hours, due to the foot pain (R. 241). She watches television for most of the day (R. 227). She drives at least once per week, to obtain medical treatment or groceries (R. 225). Sometimes she will go for walks of no more than a mile, but has fallen multiple times (R. 228-29).

2

Plaintiff testified that she receives $264 a month from the Family Independence Agency (R. 225). Her last employment was as a production worker in a factory, where she had to lift packages weighing up to thirty-five pounds (R. 229-30). She had back pain for a few years prior, but on March 19, 2002, the pain began to shoot down her leg (R. 230). She was sent to a chiropractor, who referred her to a medical doctor (R. 230). She has not returned to work (R. 230). Every day she has pain, but since her surgery she complains of foot pain that is the most severe (R. 231). Since her surgery, she rates her back pain at eight out of ten, and her foot pain at ten out of ten (R. 232). She is able to sit for at most an hour, only fifteen minutes comfortably (R. 236). She can walk for at most a half hour, but prefers to stand for no more than ten minutes (R. 236). After her surgery, she tried Vicodin, Tylenol 3 with codeine, and Valium, but stopped taking them when she found them ineffective (R. 237). She would like to try to go back to work if her foot and back pain were diminished (R. 244).

Plaintiff also experiences panic attacks and depression, which she finds more bothersome than the back and foot pain (R. 233). She has panic attacks at least once a day, for which she used to go to the emergency room, but has not done so in a couple of years (R. 234-35). She sees a psychiatrist and a psychotherapist, and is taking Paxil and Xanax (R. 233-34). She had seen a psychiatrist in 2000, but stopped for a brief period because her insurance would only cover a limited number of visits (R. 241). She reported that she had to return when the lack of concentration and frequent panic attacks became intolerable (R. 240-41).

Plaintiff also has diabetes, for which she sees a doctor every other month (R. 238-39). She measures her blood sugar herself twice a day (R. 239).

3

2.      *Vocational Expert's Testimony*

Vocational Expert James Fuller answered two ALJ hypothetical questions (R. 245). The first hypothetical included Plaintiff's anxiety disorder, depression, hypertension, headaches, and upset stomachs. It also limited Plaintiff to lifting no more than ten pounds; only occasionally bending, stooping, and squating; sitting for six hours out of an eight hour day, but only able to stand or walk for two hours (R. 247-48). The ALJ further limited the hypothetical worker to no contact with the public, a low stress level, and only simple, routine, unskilled work (R. 248). VE Fuller responded that such a worker could not perform Plaintiff's past work, but could be employed as a security guard or as a worker doing assembly, packaging, and sorting (R. 249). He reported that there are 2,000 guard jobs, and 6,000 of the latter jobs in Southeast Michigan (*Id.*). He confirmed that his testimony is consistent with the Dictionary of Occupational Titles (*Id.*).

The ALJ then asked the VE to consider the above hypothetical, except that the hypothetical person experienced daily pain at a level of eight out of ten (*Id.*). The VE responded that such a person would not be able to concentrate, and thus would be precluded from working in the jobs previously listed, as well as all other types of competitive employment (R. 250).

3.      *Medical Records*

4

On May 18, 2000, she was evaluated by Dr. Bogdanovic (R. 96). He found that Plaintiff

has a panic disorder without agoraphobia, and assessed her GAF at 65-70 (R. 98).[1] He prescribed

Zoloft and Xanax to help with her panic attacks (R. 98).

On June 20, 2000, Plaintiff met with Dr. Jeffrey Levin (R. 104). He concluded she

suffered from panic disorder and secondary tension headaches (R. 104). He prescribed Inderal,

100 mg/day, in addition to Zoloft, 75 mg, and Xanax, .25 mg. tid (R. 104).

On October 10, 2000, Plaintiff returned to Dr. Levin (R. 106). She reported an ability to

function well and to work without difficulty; she was no longer having headaches (R. 106). On

September 25, 2001, she again met with Dr. Levin, who concluded her anxiety disorder was

stable (R. 107).

Following her last day at work, Plaintiff underwent an MRI on March 20, 2002, that

showed significant lumbar spinal canal stenosis at "L4-5 from a Grade I to 2 spondylolisthesis at

that level" (R. 116). On April 14, 2002, Plaintiff met with Dr. Gerald Schell, a neurosurgeon (R.

116). He noted that she walked with a significant antalgic gait and seemed miserable and quite

---

[1] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). See id. at 32. A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." Id. A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." Id. A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. Id.

uncomfortable (R. 116). Surgery was discussed because Dr. Schell felt the problem was getting worse (R. 116). He believed that Plaintiff would be unable to work for nine months (R. 173).

On July 16, 2002, Dr. Schell performed a decompressive laminectomy, pedicle screw fusion, cage fusion, lateral mass fusion, and grafting (R. 120-136).

On August 9, 2002, Ronald Marshall, Ph.D, L.P., the FIA's medical consultant, completed a mental Residual Functional Capacity assessment (R. 146-49) and a physical Residual Functional Capacity Assessment (R. 150-171). He concluded that Plaintiff had the RFC to lift twenty pounds occasionally, ten pounds frequently, stand and walk six hours in an eight hour workday, sit six hours per day, occasionally climb stairs but never scaffolding, occasionally balance, stoop, kneel, crouch, and crawl (R. 151-52). Dr. Marshall also found that Plaintiff's reported physical limitations of lifting no more than five pounds, walking more than fifty feet without stopping, and her limits in siting or standing for long periods of time were attributable to a medically determinable impairment (R. 155).

On September 10, 2002, Dr. Schell predicted that Plaintiff would be off work until July 2003 (R. 181).

On January 13, 2003, Plaintiff was examined by request of the Family Independence Agency by Dr. M. Sohail Jilani (R. 143-45). Plaintiff reported that she had developed pain in her right foot after the surgery, and continued to experience lower back pain down to her legs, with a severity level of seven out of ten (R. 143). Dr. Jilani noted that a 2002 x-ray documented the loss of normal curvature of the spine (R. 143-45). He also found that she suffered from an antalgic gait, tenderness on palpation of the spine, and decreased range of motion in all planes (R. 145). He noted that there was skin discoloration in her right foot and her legs were cold, the right more

6

than the left (R. 144-45). He found Plaintiff's range of motion of her lumbar spine was reduced
25 - 50% (R. 143-45). Plaintiff reported that her surgeon told her to remain off work until he
released her (R. 144). Dr. Jilani agreed, writing that he did not believe she could work full time
in any capacity (R. 144). Based on Dr. Jilani's report, Plaintiff was found to be entited to state
disability assistance (R. 176).

On January 27, 2003, Dr. Schell wrote that she should be off work for a year (R. 180).

Plaintiff met with her diabetes physician, Dr. Galina Gladka, on several occasions from
December 13, 2002, to April 16, 2003 (R. 191-201). On January 28, 2003, she met with Dr.
Gladka regarding diabetes and hypertension (R. 191). During this meeting, Dr. Gladka noted that
Dr. Schell had suggested an exercise program (R. 191). Plaintiff reported that she has been doing
"quite okay" (R. 191). Plaintiff was taking Paxil for anxiety and Xanax once per day.

On April 28, 2003, Plaintiff met with Dr. Schell (R. 201). Dr. Schell reported that
Plaintiff's "back is beginning to feel better and things are settling down" (R. 201). Plaintiff also
was experiencing a "lot" of burning dysesthetic pain in her right foot, which he believed could be
an element of RSD (R. 201). Dr. Schell ordered an EMG to rule out neurological compression
(R. 199).

On April 28, 2003, Plaintiff underwent an AP and and Lumbar Spine x-ray to check the
placement of the screws and rod from her back surgery (R. 202). The results showed no
significant interval change, but indicated bilateral laminectomy defects within L3 and L4 and
evidence of degenerative disc disease at L3-L4 and L5-S1 (R. 202).

On May 27, 2003, Plaintiff went to Huron Behavioral Health for her panic attacks and
increased feelings of depression (R. 210). The Intake Assessment notes that she was unable to

7

sleep due to back pain, and that she walked with a limp (R. 211). Plaintiff was also anxious about switching doctors due to Medicaid requirements (R. 212).

Plaintiff again went to Huron Behavioral Health on June 3, 2003 (R. 208). The treating doctor noted Plaintiff's pain and depression about not being able to work (R. 208). During her next appointment on June 16, 2003, it was noted that she had a hard time concentrating, (R. 207)

On June 17, 2003, Plaintiff met with Dr. Bogdanovic, after a three year break due to lack of insurance coverage (R. 204). Plaintiff explained that she was taking medication for her panic disorder until she lost her insurance (R. 204). Dr. Bogdanovic noted that she experienced severe pain in her legs, and would be having Cortisone injections in the near future (R. 204). She is unable to sleep due to her back pain (R. 204). Dr. Bogdanovic discussed increasing her Paxil dosage, and he concluded she had a GAF score of 50-55 (R. 206).

On June 30, 2003, Plaintiff again met with Dr. Schell (R. 200). He noted that her back was doing much better, although she still experienced pain in her right ankle (R. 200). He wrote that she was heading for injections in the ankle, and that she should try a foot orthosis to see if that would help with her ambulation (R. 200). Dr. Schell noted that Plaintiff was healing well, she had no back pain, and otherwise was generally stable (R. 200).

### 4.    ALJ Findings and Decision

The ALJ found that Plaintiff suffered from the following severe impairments: lumbar spine with radiculopathy, depression, anxiety disorder, headaches, diabetes, and hypertension (R. 18). These impairments were severe within the meaning of the Social Security Act, but not severe enough to meet or medically equal one of the impairments listed in Apcendix 1, Subpart P of Regulation No. 4 ("the listing") (R. 18). The ALJ found that Plaintiff retained the residual

8

functional capacity ("RFC") to lift ten pounds, and to sit for six of eight hours, walk and stand no more than two of eight hours (R. 20).

The ALJ rejected Plaintiff's claims of severe back and foot pain after the surgery, finding them exaggerated and unsubstantiated by the medical evidence (R. 20). The ALJ found Plaintiff's testimony not fully credible (R. 22). The ALJ noted that Dr. Schell reported that the back was improving, and she was not in pain (R. 19). The ALJ discounted Dr. Jilani's January 13, 2003, conclusion that Plaintiff was unable to work, noting that his analysis took place while she was still recovering from surgery (R. 19). Moreover, Plaintiff failed to complain of pain at her appointments of January 28, 2003, or April 16, 2003 (R. 18, referring to R. 188 and 191).

The ALJ also found her level of anxiety and depression to be compatible with employment (R. 19). The ALJ emphasized the fact that Plaintiff only recently had began seeing a psychiatrist (R. 19). The ALJ noted that the only psychiatric record previous to her recent treatment, from May 18, 2000, gave her a GAF of 65-70 (R. 19). Although accepting the more recent GAF of 50-55 as an accurate assessment of psychiatric deterioration, the ALJ concluded that this score is not inconsistent with unskilled work (R. 19). The ALJ also opined that a large part of Dr. Bogdanovic's pessimistic analysis was a result of her claims of pain, which the ALJ rejects as overstated (R. 19). The ALJ further refered to the Plaintiff's daily activities as evidence of a lack of a disablement, noting that she can still take care of herself, and can watch television without being distracted (R. 20). Finally, Dr. Marshall's opinion of August 9, 2002, found that her anxiety was severe, but not work preclusive (R. 20, referring to R. 146-47).

The ALJ finally concludes that Plaintiff is able to perform sedentary work with further exertional limitations (R. 21). The ALJ accepted the VE's conclusion that Plaintiff is unable to

9

perform any past relevant work, and then accepts the VE's finding that there are a total of 8,000 jobs in Southeast Michigan that Plaintiff can perform with her residual functional capacity: security guard or monitor (2,000 jobs) or assembly, packaging and sorting (6,000 jobs) (R. 21).

II.   ANALYSIS

A.   Standard of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Secretary of HHS*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

If the Commissioner seeks to rely on testimony of the Vocational Expert to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than his past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[2] A response to a flawed

---

[2] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's

hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

Also, an ALJ must give specific reasons when finding a Plaintiff's testimony not credible. SSR 96-7p.

42 U.S.C. 405(g) allows for the District Court to enter a judgment reversing the findings of the Commissioner, and remanding for a hearing. "[W]hen there is not substantial evidence to support one of the ALJ's factual findings and his decision therefore must be reversed, the appropriate remedy is not to award benefits. The case can be remanded under sentence four of 42 U.S.C. 405(g) for further consideration." *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 175-76 (6th Cir. 1994).

B.    Factual Analysis

Plaintiff argues (1) that the ALJ misstated evidence which deprived Plaintiff of her due process rights to a fair hearing, (2) that the hypothetical and RFC does not properly reflect Plaintiff's mental disabilities, and (3) the ALJ failed to perform a "function-by-function analysis" of Plaintiff's mental impairments.

Plaintiff argues that the ALJ misstated and misinterpreted evidence relevant to her decision, which deprived her of her "Due Process" rights to a fair hearing. In support of this position, Plaintiff outlines four paragraphs from the ALJ's decision, and contrasts them with

_____

impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

11

evidence taken from the record to suggest an unfair "spin" was given to the evidence. See Plaintiff's Brief in Support of Motion at 5-7.

Plaintiff's argument could be read in two ways. Most literally, Plaintiff could be arguing that the ALJ's interpretation of the evidence was so erroneous that it constitutes a breach of Due Process. Yet, any such findings by an ALJ would not supported by substantial evidence, and thus would not withstand the review process due a claimant under 42 U.S.C. § 405(g).

Alternately, Plaintiff could be implying that the ALJ was biased and thus Plaintiff was not afforded a fair hearing. See Plaintiff's Brief in Support of Motion at 8. [3] Yet Plaintiff sets forth no specific evidence of bias other than a unfavorable decision, which is insufficient to support such an argument. *See e.g., Peter v. Comm'r of Soc. Sec.*, No. 98-3410 (6th Cir. 1998) (citing *Navistar Int'l Transportation Corp. v. United States Environmental Protection Agency*, 941 F.2d 1339, 1360 (6th Cir. 1990)) ("In order to show that a decision maker is biased, the bias must be evident from the record and cannot be based upon speculation or inference. Officials with authority to decide judicial matters are presumed to exercise their authority with honesty and integrity.")

In the absence of any showing of ALJ bias other than arguments from the ALJ decision itself, Plaintiff's "due process" claim will be treated as an emphatic assertion that the ALJ misstates the record and mischaracterizes it to reach a decision that is not supported by substantial evidence under § 405(g).

---

[3] "Taken in isolation one of the above examples by the ALJ would not be enough to demonstrate Ms. Edwards was denied her Due Process rights to a full and fair hearing with an impartial adjudicator. However it is obvious from the pattern of misstatements and the ALJ's 'spin' on the evidence which demonstrates that the deck was stacked against Ms. Edwards... The only way the ALJ could justify denial was to spin the facts to justify the end result."

Plaintiff argues that the ALJ decision relies on facts inconsistent with the medical record. First, Plaintiff argues that the ALJ's conclusions regarding her emotional limitations are not supported by the evidence because the ALJ overemphasized the May 18, 2000, psychiatric evaluation, which occurred nearly two years *prior* to the disability onset date of March 19, 2002, a time Plaintiff was working and admittedly not claiming disability status. In addition, Plaintiff's counsel argues that the ALJ's inference that television watching is a sign of an ability to concentrate "warps reality." As noted below, the ALJ's limited attention to the possible vocational impact of Plaintiff's concentration problems is of legal significance. Plaintiff also contends that the ALJ misread evidence related to Plaintiff's back injuries. The ALJ's read that "there were no complications from the surgery. Nor was there any evidence that she could not return after reasonable recuperation" conflicts with Dr. Schell's and Dr. Jilani's notes. Further, counsel argues that the ALJ's conclusion that Plaintiff overstated her pain due to lack of using medication overlooks the alternative explanations of lack of insurance and the ineffectiveness of the pain medicine for Plaintiff.

### i.    Plaintiff's mental impairments

Although Plaintiff argues that the ALJ's conclusions regarding the severity of Plaintiff's mental disabilities is erroneous, the ALJ discussed and considered the records of both Plaintiff's therapist and her psychiatrist (R. 19). The ALJ noted that her treating psychiatrist, Dr. Bogdanovic, gave her a GAF of 50-55, which, while indicative of serious psychiatric symptoms, is still consistent with unskilled work (R. 19) (See footnote 1, *supra*.) Her therapist's records show an improvement by July 2003 (R. 19). While her conditions was seen as "decompensating" in May 2003 (R. 209), her therapist noted improvement in June and July (R,.

13

203, 207-08). Dr. Marshall, concluded on August 9, 2002, that Plaintiff's anxiety was severe, but it did not prevent her from working (R. 20). The ALJ also found significant the fact that Plaintiff is able to take care of her hygiene and errands supports to conclude that Plaintiff is free from serious mental disabilities (R. 20). Yet, the ALJ does not acknowledge that in June 2003 Dr. Bogdanovic found that her "functioning has declined significantly since the last time I [have] seen her" which was in 2000 (R. 205.) Plaintiff has never alleged that her failure to do work was because of a mental disability. Given the inconsistent state of the record, the ALJ's conclusions that Plaintiff is not disabled from all work due to her mental limitations is sufficiently supported by substantial evidence and should not be disturbed by this Court.   Yet, symptoms of psychiatric impairments, even if not disabling in themselves, may be vocationally significant.

Plaintiff argues that ALJ Jachnycky failed adequately to incorporate these factors into his hypothetical to the VE. Although SSR 96-8p requires that the RFC must "assess [claimant's] work-related abilities on a function-by-function basis," there is caselaw that the ruling "does not require ALJs to produce such a detailed statement in writing. *Delgado v. Comm'r of Soc. Sec.*, 2002 WL 343402, at *5 (6th Cir. 2002) (quoting *Bencivengo v. Comm'r of Soc. Sec.*, No. 00-1995 (3rd Cir. Dec 19, 2000)) ("Although a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing"). Yet the ALJ must properly account for any and all limitations that he finds in his hypothetical question to the VE. A hypothetical question posed to the VE should include specific job-related restrictions, rather than broad limitations or categorical terms.

14

In *Bankston v. Comm'r of Soc. Sec.*, 127 F. Supp. 2d 820 (E.D.Mich. 2000), the Court noted that it was reasonable to conclude under the regulations "that a mental deficiency occurring 'often' may not be consistent with substantial gainful employment." *Bankston*, 127 F. Supp. 2d at 826. The Court then determined that under the relevant portion of the PRTF, "often" should logically be defined as fifty percent of the time. *Id.* at 827. There, the finding that the claimant "often" had deficiencies of concentration, paired with the uncontested findings of the treating physician that he was disabled, resulted in a judgment of disability and a remand for award of benefits.

Yet, the Sixth Circuit has since held that an ALJ's failure to include in a hypothetical question a PRTF finding that a claimant "often" has difficulty concentrating is not a basis for remand when the hypothetical question adequately describes that claimant's limitations arising from a mental impairment. *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). In *Smith*, the ALJ marked on the PRTF that Smith "often" suffered deficiencies of concentration, persistence or pace, but did not include that finding in the hypothetical question to the VE. Smith, relying on cases similar to *Bankston*, argued for a remand based on that omission. The Sixth Circuit, without citing *Bankston*, held that the hypothetical question asked by the ALJ was adequate. The court noted that while the ALJ checked a single box in a 1-5 rating scale on a standard psychiatric assessment form

> the ALJ went beyond this simple frequency assessment to develop a complete and accurate assessment of Smith's mental impairment, as *Varley* requires. In particular, the ALJ relied on the testimony of four physicians who characterized Smith's concentration problems as minimal or negligible. The ALJ then translated Smith's condition into the only concrete restrictions available to him—examining psychiatrist Schweid's

15

recommended restrictions against quotas, complexity, stress, etc.– and duly incorporated them into his hypothetical to the vocational expert. *Id.* at 379.

The Court distinguished several unpublished district court cases similar to *Bankston* because the ALJ's in those cases did not include the finding that the claimant "often" had difficulty concentrating, nor did they otherwise account for such a limitation. *Id.* Thus, when the ALJ makes a PRTF finding that the claimant "often" has problems with concentration, but does not specifically include that limitation in the hypothetical question, the question is whether the ALJ used adequate alternate concrete job restrictions in the hypothetical question that suitably accommodated the worker's concentration limitations.

Here, the ALJ, as well as Dr. Marshall, found that Plaintiff has a "moderate limitation in her ability to concentrate, persist and keep pace," which under the Commissioner's new psychiatric regulations parallels the prior category of "often" (R. 20 & 168). Unlike the *Smith* case, the present case does not include "the testimony of four physicians who characterized [the Plaintiff's] concentration problems as minimal or negligible." Indeed, Plaintiff's most recent GAF of 50-55 by Dr. Bogdanovic shows "moderate difficulty in . . . occupational functioning."

In *Smith*, the ALJ in addition to noting the four physicians who characterized the Smith's concentration problems as minimal or negligible also incorporated into his hypothetical question "restrictions against quotas, complexity, stress, etc." Here, the ALJ had less weighty counter evidence concerning concentration than in *Smith*, and he limited the hypothetical worker's dealing with coworkers and supervisors, and the public and precluded all but simple, routine, unskilled work. ( R. 248).

16

One court has held that a reference merely to "unskilled sedentary work" in a hypothetical question is insufficient to describe and accommodate concentration deficiencies. *Newton v. Chater*, 92 F.3d 688 (8th Cir. 1996); *McGuire v. Apfel*, 1999 WL 426035, at *15 (D. Ore. 1999). This Court in *Keyser v. Barnhart*, No. 03-60078 (E.D. Mich Sept. 2, 2004) (unpublished), held that a hypothetical question of "unskilled jobs with a low stress level alone" is not sufficient to accommodate a claimant who, under the Commissioner's new regulations, has "moderate limitations with respect to concentration, persistence or pace."

Again, in the present case, while finding that Plaintiff has a "moderate limitation in her ability to concentrate, persist and keep pace," the ALJ's limitations were with co-workers, supervisors and the public, and to "jobs entailing no more than simple, routine, unskilled work" (R. 18- 19, 248). While close, these are not sufficient, and do not fully convey Plaintiff's limitations in concentration to the VE. *See Keyser*, No. 03-60078; *c.f. Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job. The current hypothetical question is not adequate on the issue of moderate limitations of concentration, persistence and pace for this Court to have any idea as to the number of the assembly, packing, and sorting or security guard jobs identified by the VE that would be excluded if quotas or other aspects related to moderate concentration limitations were added to the hypothetical question. Each of these jobs seems to require a degree of sustained concentration, persistence and pace. The ALJ's argument that Plaintiff's daily watching of television is not sufficient evidence on this record to conclude her concentration is not significantly impaired. Thus, the ALJ's hypothetical question is insufficient.

17

An improper hypothetical question cannot serve as substantial evidence under § 405(g), and can result in a remand or reversal. *Whitmore v. Bowen,* 785 F.2d 262, 263-64 (8th Cir. 1986); *See also Varley,* 820 F.2d at 779 ("Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only 'if the question accurately portrays [plaintiff's] individual physical and mental impairments'"). This case should be remanded to determine whether jobs exist consistent with Plaintiff's limitations in concentration.

ii.    Plaintiff's Physical Impairments

Turning to the issue of the Plaintiff's physical disabilities, the ALJ found that Plaintiff was limited to lifting no more than ten pounds; only occasionally bending, stooping, and squating; sitting for six hours out of an eight hour day, but only able to stand or walk for two hours (R. 247-48). Further, the ALJ found that Plaintiff did not suffer from debilitating pain, and thus did not reflect pain in the hypothetical question ultimately adopted by the ALJ.

The ALJ acknowledged Plaintiff's back pain prior to surgery, but concluded that surgery alleviated most or all of it, relying on the report of Plaintiff's surgeon, Dr. Schell, that her back was doing much better (R. 19-23). The ALJ considered Dr. Jilani's report that Plaintiff was experiencing back pain at a severity level of seven out of ten, but de-emphasized by noting it was only a few months after surgery, well within expected recovery time (R. 19). The ALJ noted that Plaintiff did not report back pain to her treating doctor on June 30, 2003, but then testified that she was experiencing back pain before the ALJ (R. 200). This diminished Plaintiff's credibility to the ALJ. Moreover, the ALJ concluded, examinations performed by her physicians failed to

18

demonstrate any basis for the back pain. Thus, the ALJ does have stated reasons for his rejection

of Plaintiff's allegations of post-surgery back pain.

Yet, the ALJ also rejected Plaintiff's claims of post-surgery pain radiating down her leg

(R. 16-19). The standard for an administrative law judge's credibility findings is as follows:

> The adjudicator must consider the entire case record and give
> specific reasons for the weight given to the individual's statements.
> The finding on credibility of an individual's statements cannot be
> based on an intangible or intuitive notion about an individual's
> credibility. The reasons for the credibility finding must be
> grounded in the evidence and articulated in the determination or
> decision. It is not sufficient to make a conclusory statement that
> "the individual's allegations have been considered" or that "the
> allegations are (or are not) credible." It is also not enough for the
> adjudicator simply to recite the factors that are described in the
> regulations for evaluating symptoms. The determination or
> decision must contain specific reasons for the finding on
> credibility, supported by the evidence in the case record, and must
> be sufficiently specific to make clear to the individual and to any
> subsequent reviewers the weight the adjudicator gave to the
> individual's statements and the reasons for that weight. This
> documentation is necessary in order to give the individual a full
> and fair review of his or her claim, and in order to ensure a well-
> reasoned determination or decision.

S.S.R. 96-7p. Although the ALJ put forth specific reasons to reject Plaintiff's claims about the

extent of her post-surgery back pain, he failed to justify his rejection of her claims about foot

pain. *See Hardin v. Heckler*, 795 F.2d 674, 676 (8th Cir. 1987). Even without Plaintiff's

testimony about her foot pain, the ALJ either disregards or misinterprets the consistent evidence

in the record establishing Plaintiff's foot pain. The ALJ contends that Plaintiff did not complain

of back pain to Dr. Gladka, who she was seeing for a follow-up appointment regarding diabetes,

hypertriglyceridemia and hypertension on January 28, 2003, but fails to mention that one day

prior Dr. Schell, her neurosurgeon, wrote that she would be unable to work for a year (R. 18, 180,

191). The ALJ also overlooks complaints to Dr. Gladka on December 13, 2002, and December 31, 2002 (R. 194-95). The ALJ further discounted Plaintiff's claims of pain based on her failure to obtain medication for the pain, a conclusion not supported by the record (R. 19). Plaintiff tried medication, including Vicodin, Tylenol 3 with codeine, and Valium, but found them to be ineffective (R. 237). Dr. Bogdanovic's psychiatric evaluation of Plaintiff dated June 17, 2003, corroborates this testimony (R. 204). Dr. Schell notes that the medication was ineffective, and arranged for Plaintiff to begin to receive Cortisone injections in the ankle (R. 200). Plaintiff was instructed by Dr. Gladka to stop taking the Tylenol prescribed because it was ineffective (R. 197). The ALJ also relies on Dr. Schell's opinion that he is unsure whether there is a "tru[e] weakness."

The ALJ may reject claims of pain that do not seem to come from any medically established affliction. C.F.R. §404.1529; *See also Duncan v. Secretary of HHS*, 801 F.2d 847, 853 (6th Cir. 1986) (adopting a two-tiered analysis, where "[f]irst, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.") Although Plaintiff's physicians have not conclusively identified the source of the pain, none have concluded there is no underlying cause. Dr. Schell writes that it could be an element of Reflexive Sympathetic Dystrophy Syndrome ("RSD") (R. 201). Dr. Jilani also wrote that the leg pain could be from RSD, and noted that upon examination that there was discoloration in her right foot (R. 177-79). The ALJ, without any medical expertise, substitutes his own opinion that Plaintiff suffers from

20

no injury for that of the medical experts who examined her. To the contrary, Plaintiff has

consistently alleged foot pain in her initial disability application, in her testimony before the ALJ,

repeatedly to her neurologist Dr. Schell, to her psychiatrist Dr. Bodanovic, to state agency

physician Dr. Jilani, and to her internal medicine physician Dr. Gladka (R. 56, 195, 200-01, 204,

231). The ALJ's conclusion that Plaintiff does not experience foot pain is not supported by the

weight of the medical evidence. *See Hardin*, 795 F.2d at 676.

The ALJ failed to account for the foot pain and resulting limitations in his hypothetical to

the VE. For instance, the ALJ's conclusion that Plaintiff can stand, sit, and walk for extended

periods is not supported by substantial evidence. *See Richardson*, 402 U.S. at 401. Indeed, the

overwhelming weight of the medical evidence and testimony suggests that, at the time of the

hearing, Plaintiff was severely limited in her ability to walk, sit, and stand for extended periods,

and experienced significant pain in her right leg. Because the ALJ failed to incorporate this

limitation in his hypothetical to the VE, the hypothetical was flawed and is insufficient to show

that significant jobs exist in the region. *See Varley*, 820 F.2d at 779.

*Faucher v. Sec'y of HHS*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25

F.3d 316, 318 (6th Cir. 1994), held that after finding reversible error it is appropriate for this

Court to remand for an award of benefits only when "all essential factual issues have been

resolved and the record adequately establishes a plaintiff's entitlement to benefits." This

entitlement is established if "the decision is clearly erroneous, proof of disability is

overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Faucher*

citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

21

In this case "all essential factual issues" have been *not* been resolved with regard to impact of Plaintiff's concentration limitations and right leg pain on her vocational capacity. Nor is this a case where "proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." Accordingly, a remand for further administrative proceedings consistent with this Report and Recommendation is necessary.

III.   RECOMMENDATION

For the above reasons, IT IS RECOMMENDED that Defendant's motion for Summary Judgment be DENIED, and the Plaintiff's Motion for Remand be GRANTED. The ALJ is to determine the extent of Plaintiff's sitting, standing, and walking limitations, and determine through VE testimony how many jobs exist in the region consistent with these limitations. He is also to determine the number of jobs consistent with Plaintiff's moderate limitations in concentration, persistence, and pace through an adequate hypothetical question to the VE.

The parties to this action may object to and seek review of this report and recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C.. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this report and recommendation. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty

22

(20) pages in length unless by motion and order such limit is extended by the court.  The

response shall address specifically, and in the same order raised, each issue contained within the

objections.

Dated: June 30, 2005
Ann Arbor, Michigan

Steven D. Pepe
United States Magistrate Judge

Pursuant to Rule 77(d), FRCivP
COPIES HAVE BEEN MAILED TO THE
FOLLOWING:

Lewis Seward

Janet L. Parker

on  6/30/05

DEPUTY CLERK

23